[Cite as *Manshadi v. Mossayebi*, 2011-Ohio-1469.]

STATE OF OHIO, MAHONING COUNTY

IN THE COURT OF APPEALS

SEVENTH DISTRICT

| | | |
|---|---|---|
| FATEMEH DEHGHAN MANSHADI, | ) | |
| | ) | CASE NO. 10 MA 2 |
| PLAINTIFF-APPELLANT, | ) | |
| | ) | |
| - VS - | ) | O P I N I O N |
| | ) | |
| FARAMARZ MOSSAYEBI, | ) | |
| | ) | |
| DEFENDANT-APPELLEE. | ) | |


CHARACTER OF PROCEEDINGS:       Civil Appeal from Common Pleas Court,
                                Domestic Relations Division, Case No.
                                08DR689.


JUDGMENT:                       Affirmed.


APPEARANCES:
For Plaintiff-Appellant:         Attorney Bruce Broyles
                                 164 Griswold Drive
                                 Boardman, Ohio  44512


For Defendant-Appellee:          Attorney Matthew Giannini
                                 1040 South Commons Place, Suite 200
                                 Youngstown, Ohio  44514


JUDGES:
Hon. Joseph J. Vukovich
Hon. Gene Donofrio
Hon. Mary DeGenaro


                                 Dated:  March 22, 2011

VUKOVICH, J.

**¶{1}** Fatemeh Dehghan Manshadi (the mother) appeals the decision of the Mahoning County Domestic Relations Court, which named Faramarz Mossayebi (the father) as the residential parent of the parties' two children. The mother contends that the court erred in failing to rule on her motion for hair follicle testing and for an alcohol assessment. However, the court was not required to rule on this motion where the mother failed to obtain a hearing date as required by local rule.

**¶{2}** The mother then argues that the court erred in failing to appoint a new psychologist and to exclude the report of the court-appointed psychologist, whom she claims failed to conduct a full evaluation. We hold that the decision to accept the report and allow the expert to testify was within the trial court's sound discretion.

**¶{3}** The mother lastly urges that the court abused its discretion in naming the father as the residential parent. However, under the facts and circumstances of this case, the trial court could rationally find that it was in the children's best interests to have their father as their residential parent with their mother exercising extended parenting time. As such, the judgment of the trial court is affirmed.

<u>STATEMENT OF THE CASE</u>

**¶{4}** The parties had a child in February of 2007 and another child in February of 2008, both of whom are citizens of the United States. The parties, however, are Iranian nationals. The father has lived in the United States since 1976. He has political asylum here, and he has an application to be a permanent resident pending. The mother moved from Iran to Canada in 1997. She is now both an Iranian and a Canadian citizen. The mother came to the United States in 2006 on a work visa, which was changed to a student visa once she married the father in April of 2006 and began attending college. The mother's student visa expired in August of 2009 due to her failing to register as a student. At the time of the divorce hearing, she had only an application for a temporary visa pending, intending to only stay in the country long enough to finish the court proceedings.

¶{5} In December of 2008, the mother filed for divorce and asked to be named the residential parent. In his answer, the father asked that he be named the residential parent. He then filed a proposed shared parenting plan with equal parenting time. The case was tried to the court on September 28, 2009.

¶{6} The father testified that he is fifty years old, has a Ph.D. in engineering, and is a college professor. He expressed that he wanted to be named the residential parent if the mother moved to Canada and that he preferred shared parenting if the mother moved two hours away or stayed local (although, he also voiced that he would have no real objection to the mother being named residential parent if she stayed local). (Tr. 38-40, 499-500). He anticipated difficulties crossing international borders in order to exercise visitation with his children if the mother moved to Canada with them. (Tr. 46). He stated that he engaged in many caregiving responsibilities for the children during the marriage. (Tr. 502). He testified that the mother does not drink and that he consumes one or two glasses of wine or beer with one additional drink on weekends. (Tr. 510-511, 540).

¶{7} He disclosed that the parties engaged in many physical confrontations throughout their marriage. (Tr. 53). He alleged that the mother was almost always the initiator and that he would grab, push, and hold her in order to disengage her. (Tr. 58, 68, 512, 514, 522). He explained that she continually and irrationally accused him of being unfaithful. He provided examples. Once he entered the car and handed her an ice cream cone, she accused him of cheating and threw a cone at him, which ricocheted off his hand and injured her face. (Tr. 62-63). As another example, he disclosed that she accused him of cheating on her with a server who waited on them at a restaurant and then jumped on him while hitting him. (Tr. 66). He stated that her nose may have been injured during this episode but noted that she had a preexisting injury from her first husband in Canada; the mother's medical evidence confirmed a preexisting nose injury. (Tr. 71). The father testified that both parties had been to the hospital and the police as a result of the fighting.

¶{8} The mother was forty-five years old with a bachelor's degree, two master's degrees, and was partially through another degree. She expressed her intent to move to Canada with the children, a country she has not visited in four years. (Tr.

138, 330). She claimed that her brother's friends in Toronto were going to let her move in with them and support her even though she has not seen them in nearly ten years. (Tr. 139-151, 331). Her brother, however, lives on the other side of the country in Vancouver. (Tr. 135). She then stated that if the court requires her to live closer, she would move to Niagara Falls. (Tr. 142). She refused to stay in Mahoning County. (Tr. 374). She was recalled later to testify that if the court wished her to remain in the United States and to stay within two hours, she would move to Pennsylvania or West Virginia. (Tr. 624-625).

¶{9} The mother, who did not work after having children but who did attend college, stated that the father only sometimes cared for the children and recognized that her brother was the primary caregiver for one child for some months while he lived with them. (Tr. 285, 292, 387, 422). She also acknowledged that the children were in daycare three to four days per week. (Tr. 289-290).

¶{10} The mother generally alleged that the father used drugs and that he once put them where a child could access them. (Tr. 165). She alleged that the father beat her up "every single day," sometimes merely because she talked too loud and sometimes merely so he would have an excuse to leave the house. (Tr. 151, 303, 306-308). She said he put a gun to her head and a knife to her throat. She testified that he once hit her in the back of the head while she was holding a child and that he tried to push a child down the steps. (Tr. 152, 164, 305). She said the father would often "twist" her back or squeeze the back of her neck. (Tr. 304). She denied that she ever hit him. (Tr. 311).

¶{11} Her obstetrician testified that she reported emotional abuse to him and that there "may have been claims" of physical abuse as well. She insisted that he not report her allegations as she feared her husband could be deported. (Depo. 12-13).

¶{12} The mother's immigration attorney opined that the father could obtain a refugee travel document and that he would not have more problems crossing the Canadian border than anyone else. (Tr. 96-97). She noted that the children may be citizens of Iran and that the father could not enter Iran or return from Iran due to his political asylum here. (Tr. 96, 106). On the topic of visa requests, she acknowledged

that processing was more detailed and took longer on those from Middle Eastern countries. (Tr. 93).

¶{13} The court-appointed psychologist noted in his report that the parties did not fit the stereotypes for Iranian culture, noting that they are not Muslim, the mother is independent, and the father did not act as the voice of the household. The psychologist testified that most of the mother's reports bordered on incredulous. For instance, when the children were sick after a supervised visit, she claimed that the father infected them. (Tr. 191). She has also claimed that he poisoned them. The psychologist contrasted how the mother characterized the father as evil while the father praised her mothering abilities. (Tr. 205, 229). He described how she was upset that the father took photographs of the children and provided them with copies at the next visit. (Tr. 205, 226, 229).

¶{14} The psychologist's report noted that the mother blames any negative situations involving the children on the father, even though his contact with them has been limited by her actions. The report also found it odd that she lamented how the father did not help her or show more interest in the children when it was her actions that resulted in the father not being able to contact her or see his children outside of the supervised visitation center. The psychologist believed that the mother was overly sensitive to drinking alcohol and stated that the father talked freely about his consumption of alcohol. (Tr. 213). He noted the father characterized the mother as jealous, suspicious, angry, and paranoid. (Tr. 250). The report found the mother's allegations and desires "not only unconventional but frankly bizarre" and her beliefs "almost delusional."

¶{15} The psychologist noted the mother's strong intent to leave the country. (Tr. 200). He worried that she would deny the father access to the children. (Tr. 204). The psychologist voiced that there was no reason to disrupt the children's lives by moving hours away from their father. (Tr. 207). The psychologist was impressed by the father's parenting skills and the children's bond with him. (Tr. 227). The report found the father to be cooperative, non-defensive, and lacking in an agenda. An anger inventory found the father to be well within the low to average range on all scales and found no indications of invalid responding. Although the psychologist found that the

mother was not inclined to work cooperatively, he recommended shared parenting and the appointment of a mediator. However, if the mother were to leave the country, he would recommend that the father be named the residential parent. (Tr. 230-231).

¶{16} The guardian ad litem was also impressed with the father's caregiving skills. (Tr. 571-574). For instance, he arrived at a surprise visit at the father's apartment to hear a child crying; he eavesdropped outside the door and heard the father responding to the child in a very gentle manner. (Tr. 571). He described the father as a calm arbitrator between the children's disputes over toys. (Tr. 573). He agreed that the children were loving to him. (Tr. 572). The guardian ad litem expressed concern over the mother's mindset toward the father. (Tr. 580). He recommended that the mother be named the residential parent (with the father having more than standard visitation) if she lived within two hours of the area but the father be named the residential parent if the mother moved to Canada. (Tr. 559-560).

¶{17} The mother told the guardian ad litem she was moving to Montreal even though she told the court she was intending to move to Toronto. (Tr. 579). The guardian ad litem did not believe the mother would facilitate visitation once she left the country. (Tr. 566, 580). He noted the benefit to the children of remaining in their family home, which was the separate property of appellee and would be awarded to him after the divorce. (Tr. 577).

¶{18} The guardian ad litem's report opined that shared parenting would not work due to the mother's lack of cooperation and her inability to encourage the love, sharing, and contact between the children and the father. He found that each party may have been both a perpetrator and a victim of domestic violence. He also found that the mother was not amenable to mediation as recommended by the psychologist.

¶{19} On December 11, 2009, the court issued a fifty-four-page decision. In it, the father was named the residential parent. The mother was provided more than standard parenting time, with two overnights during the week that does not contain her weekend. The mother filed a timely notice of appeal.

<u>ASSIGNMENT OF ERROR NUMBER ONE</u>

¶{20} Appellant's first assignment of error provides:

¶{21} "THE TRIAL COURT ERRED IN FAILING TO ORDER THE HAIR FOLLICLE TESTING AND ALCOHOL ASSESSMENT BASED SOLELY UPON APPELLANT FAILING TO OBTAIN A HEARING DATE."

¶{22} On June 24, 2009, the mother filed a motion stating that it may be necessary to conduct hair follicle testing and an alcohol assessment on the father. Her counsel withdrew two days later. New counsel entered an appearance two weeks later.

¶{23} In the December 11, 2009 divorce decree, the court noted that the mother had filed a request for hair follicle testing and an alcohol assessment. The court found that the mother did not obtain a hearing date when the motion was filed; in fact, the standard notice of hearing date language had been crossed out by her attorney. The court disclosed that it would have addressed the motion had a hearing date been obtained. The court also stated that this motion is presumed to have been denied since it was not ruled upon prior to trial. In addition, the court voiced that it was not convinced that a hair follicle test or alcohol assessment was warranted, finding a prior assessment administered by the parties' counselor lacked credibility and noting that the counselor told the guardian ad litem that the father was not dependent on alcohol. The court also pointed out that the mother did not specify the extent of the father's drinking.

¶{24} On appeal, the mother claims that she provided sufficient information to justify a hearing on her motion. She also claims that there is a discrepancy in Local Rules 8.09 and 8.12, which should mean that the court cannot disregard a motion merely because a hearing date is not obtained.

¶{25} Mah. Cty. Dom. Rel. Loc.R. 8.09 provides in pertinent part: "All motions shall first be scheduled for hearing by the Assignment Commissioner, then filed with the Clerk of Court and shall be subject to either affidavit or evidentiary hearing." Loc.R. 8.12, entitled "Determination of Motions without Oral Hearing," states the following: "Pursuant to Civil Rule 7(B), the Court may, to expedite its business, determine motions without oral hearing upon the submission of brief written statements of reasons in support and opposition." See, also, Civ.R. 7(B)(2) ("To expedite its business, the court may make provision by rule or order for the submission and

determination of motions without oral hearing upon brief written statements of reasons in support and opposition.").

¶{26} Contrary to the mother's assertion here, these rules are not contradictory. The movant must schedule their motion for a hearing. This does not necessarily mean an oral hearing. Moreover, even if an oral hearing is scheduled, the fact that the court can later determine that an oral hearing is unnecessary is not a contradiction of a rule that requires the movant to obtain a hearing date.

¶{27} Here, the movant consciously failed to ask for a hearing date at the time the motion was filed (consciously because the notice of hearing date language was physically crossed out). Notably, counsel had also filed a request for a psychological evaluation, and a hearing had been requested and held on that matter. New counsel took over the case two weeks after the motion for hair follicle testing and an alcohol assessment was filed. New counsel did not attempt to revive this motion by obtaining a hearing date. Thus, neither attorney felt the matter to be of pressing pretrial importance.

¶{28} In any event, as the court opined, the court heard testimony at the divorce hearing about the mother alleging to various individuals that the father had an alcohol problem and used marijuana. The court concluded that the mother could provide no specifics as to the father drinking or using drugs; she did not say how often or how much he drank or what drug he allegedly used. The most testimony on either matter was "he used drugs -- I remember once he put drugs somewhere that my oldest son could access." (Tr. 165). The court heard the father testify as to the amount of alcohol he consumed. The court found him credible and concluded that his admitted use was not problematic.

¶{29} The court heard the parties' counselor's testimony on an alcohol assessment he once administered. The court noted that the claimed results were not credible as the name on the test was not that of the father, parts of the test were incomplete, some answers were found to be insignificant, and the counselor had advised the guardian ad litem that the father was not dependent on alcohol. Moreover, there was no follow-up to discuss each question and answer. Plus, the counselor

works under the assumption that if one spouse is against drinking, then there is a problem to be addressed.

¶{30} Finally, the court-appointed psychologist was aware of the substance abuse allegations, questioned the parties thereon, and failed to conclude that further testing was necessary before recommending that the father receive at least shared parenting. For all of these reasons, the court did not err in failing to grant the mother's motion for a hair follicle test and an alcohol assessment.

ASSIGNMENT OF ERROR NUMBER TWO

¶{31} Appellant's second assignment of error states:

¶{32} "THE TRIAL COURT ERRED IN DENYING APPELLANT'S MOTION TO EXCLUDE THE REPORT OF DR. HARVEY KAYNE, APPOINT A DIFFERENT EXPERT AND ORDER A FULL PSYCHOLOGICAL EVALUATION AS DIRECTED BY THE MAGISTRATE'S ORDER OF JUNE 29, 2009.

¶{33} The mother filed a motion for a psychological evaluation. The magistrate held a hearing on the motion. On June 29, 2009, the magistrate appointed a psychologist and ordered a full psychological assessment and custody evaluation. The psychologist interviewed each party twice, observed the father during a one-hour visitation, interviewed a person accompanying the mother to the appointments twice, spoke to the guardian ad litem, and reviewed court documents and visitation observation reports. He also reviewed information the mother brought to her interviews such as hospital and police records and internet articles on border-crossing. Due to the allegations against the father, the psychologist administered the Novasco Anger Scale and Provocation Inventory on the father.

¶{34} On September 24, 2009, the mother moved to exclude the psychologist's report. In arguing the motion, counsel stated that the psychologist failed to conduct a full psychological assessment as ordered by the magistrate because the Anger Scale was not widely recognized, other common tests were not utilized, and he did not investigate enough claims. (Tr. 4-9). On appeal, the mother states that the evaluation was not a full psychological assessment because the psychologist failed to conduct other tests (such as the MMPI), only briefly looked at hospital and police records, did

not institute alcohol or drug testing, and did not investigate whether the father was abusive to the children.

¶{35} First, the psychologist explained that he did not believe standard tests such as the MMPI would be appropriate due to the cultural differences. He noted that the Anger Scale was simple to understand and pointed out that this was the mother's main allegation against the father in any event. As for alcohol or drug testing, the court did not order such. (See prior assignment of error.) Moreover, the psychologist interviewed the parties and found the father forthcoming on his alcohol use and found the mother overly sensitive on the father's use.

¶{36} That his review of the mother's hospital and police records was brief does not invalidate his opinion. He reviewed the records provided to him, and he interviewed her and listened to her claims. As to the mother's claim of child abuse, the psychologist reviewed the visitation observation reports and observed the father's one-hour visitation with his children. He was impressed with the father's parenting abilities. He spoke to the guardian ad litem, who was also impressed with the father's parenting. Although she brought herself to the hospital or police to report abuse, she never brought her children or reported abuse against them. The psychologist interviewed the mother but found her accusations to be incredulous and to border on delusional. Her disagreement with his characterizations does not invalidate his report.

¶{37} This expert was appointed by the court. It was within the trial court's sound discretion to conclude that the expert conducted a sufficient evaluation. Counsel pointed out these and other issues with the evaluation at trial. These were credibility issues that were within the court's province to determine. Consequently, the trial court's decision refusing to exclude the report is upheld. (Credibility issues are discussed further infra.)

### ASSIGNMENT OF ERROR NUMBER THREE

¶{38} Appellant's final assignment of error argues:

¶{39} "THE TRIAL COURT ABUSED ITS DISCRETION IN DETERMINING THAT APPELLEE FARAMARZ MOSSAYEBI SHOULD BE THE RESIDENTIAL PARENT OF THE PARTIES' TWO MINOR CHILDREN."

¶{40} A trial court has broad discretion in its allocation of parental rights and responsibilities. *Miller v. Miller* (1988), 37 Ohio St.3d 71, 74. Appellate courts must afford "the utmost respect" to the trial court's exercise of discretion because "[t]he knowledge a trial court gains through observing the witnesses and the parties in a custody proceeding cannot be conveyed to a reviewing court by a printed record." Id. See, also, *Davis v. Flickinger* (1997), 77 Ohio St.3d 415, 419 (the prohibition on reviewing courts substituting their judgment for that of the trial court is even more important in custody cases). Consequently, a reviewing court may not overturn a trial court's determination regarding the allocation of parental rights and responsibilities absent an abuse of discretion. *Pater v. Pater* (1992), 63 Ohio St.3d 393, 396. An abuse of discretion implies that the trial court's decision was arbitrary, unreasonable, or unconscionable. *Blakemore v. Blakemore* (1983), 5 Ohio St.3d 217, 219.

¶{41} In general, the reviewing court is obliged to presume that the findings of the trier of fact are correct. *State v. Wilson*, 113 Ohio St.3d 382, 2007-Ohio-2202, ¶24, citing *Seasons Coal Co., Inc. v. Cleveland* (1984), 10 Ohio St.3d 77, 80-81. This presumption arises in part because the fact-finder occupies the best position to watch the witnesses and observe their demeanor, gestures, and voice inflections and to utilize these observations in weighing credibility. Id. "A reviewing court should not reverse a decision simply because it holds a different opinion concerning the credibility of the witnesses and evidence submitted before the trial court. A finding of an error in law is a legitimate ground for reversal, but a difference of opinion on credibility of witnesses and evidence is not." Id.

¶{42} When making an original allocation of parental rights and responsibilities, the court shall take into account the child's best interests. R.C. 3109.04(B)(1). In determining the best interests of a child, the court shall consider all relevant factors, including, but not limited to: (a) the parents' wishes; (b) the child's wishes if the court has interviewed the child; (c) the child's interaction and interrelationship with the child's parents, siblings and any other person who may significantly affect the child's best interests; (d) the child's adjustment to home, school, and community; (e) the mental and physical health of all relevant persons; (f) the parent more likely to honor and facilitate court-approved parenting time rights or companionship rights; (g) whether

either parent has failed to make all child support payments pursuant to a child support order; (h) whether either parent or any member of the household of either parent previously has been convicted of or pleaded guilty to certain criminal offenses involving children; (i) whether the residential parent or one of the parents subject to a shared parenting decree has continuously and willfully denied the other parent's right to parenting time in accordance with a court order; and (j) whether either parent has established a residence, or is planning to establish a residence, outside of Ohio. R.C. 3109.04(F)(1)(a)-(j).

¶{43} The mother essentially complains here about the weight the court afforded to various pieces of evidence. However, as the father responds, the assignment of weight and the determination of which version of events is more credible are issues for the fact-finder who heard the parties testify. In fact, the trial court found the mother to lack credibility and to lack the ability to cooperate and to facilitate visitation. This conclusion was reached not just from the testimony presented (including contradictions in her testimony and her evidence) but also from the mother's demeanor, gestures, and disrespectful attitude during the course of the trial, which the court specified in its entry.

¶{44} As the court pointed out, it is the children's best interests that are relevant, not the parents' best interests. The court reviewed all of the factors in great detail in a comprehensive judgment entry. As for the parties' wishes, the father was flexible and willing to compromise if the mother would stay close as opposed to moving away. See R.C. 3109.04(B)(1)(a). The mother wishes were unstable and wavering. She voiced that she should be the sole residential parent with the father exercising only supervised visitation; yet, her proposed findings and conclusions stated that he should receive standard visitation.

¶{45} The children's interaction with both parents is positive. See R.C. 3109.04(B)(1)(c). They may have bonded more with the mother; however, they easily transition to their father's presence and are happy to see him. The mother admitted that her brother, who is now in Iran, acted as one of the children's primary caregivers during a semester she was busy with school. She claimed that the father did not engage in much childcare. Yet, the father insisted that he routinely spent time with the

children and that the parties did equal amounts of household chores including bottle and food preparation.

¶{46} Both parties were found to have good parenting skills. It was noted that the mother blames every childhood issue on the father, whereas the father does not criticize the mother's parenting. The mother had concerns with one child's speech; however, she talks 100% Farsi in the house. The father speaks approximately 60% Farsi to the children in the home and 40% English. Despite the mother's claims otherwise, the father was found to be a patient, concerned, and appropriate caregiver and a good arbitrator between the children.

¶{47} Neither party has relatives nearby, and no testimony was presented on other significant individuals. If the mother moves to Toronto as she wishes, she will only know friends of her brother that she claims will support her; she has not spoken to them in nearly ten years, and they have never met the children. If the mother moved to Niagara Falls, Pennsylvania, or West Virginia as she later stated, she would know no one.

¶{48} As for the children's adjustment to home, school, and community, although they are young and not yet of school age, the children have been enrolled in a local daycare/preschool for more than a year. See R.C. 3109.04(B)(1)(d). They often go to the father's office at the college where he is a professor. They have gone to the same pediatrician since birth. They play with the neighborhood children. The house the children have lived in their entire lives is the father's separate property. As such, giving custody to the father would not require the children to transition to a new residence or neighborhood. The mother absolutely refused to stay local. She expressed often that she was moving to Canada. She told the guardian ad litem Montreal and told the court Toronto. At the very end of trial, she finally claimed to consent to moving within two hours but still insisted it be out of state, even though she had no information as to why or where she would move.

¶{49} As for the parties' mental and physical health, the mother testified to migraine and neck problems. See R.C. 3109.04(B)(1)(e). She was described as jealous, suspicious, and paranoid. She was viewed as telling incredulous stories, as being untruthful, or as being almost delusional. For instance, she states that the father

is evil and claimed that the father poisoned the children.  There was much concern that she so strongly and irrationally desires the children to be separated from their father that this mindset will cause her to deny him visitation.

¶{50} The mother claims that father has anger and substance abuse problems. Her claims regarding the father's anger were found to be exaggerated or fabricated. An anger scale employed by the psychologist found no indication of anger problems. The mother's claims regarding appellant beating her on a daily basis need not be believed.  One could rationally believe the father's claims that almost every physical altercation was initiated by the mother and that she was only hurt as a result of her aggressiveness and his need to disengage her.  Or, one could rationally believe that the violence was mutual and that the father's actions were no worse than the mother's actions, resulting in the altercations weighing evenly against both parties.

¶{51} The mother provided no information on or examples of the father's drinking and only generally claimed that he did drugs.  The father was consistently candid about the fact that he enjoys two glasses of wine or beer per night, with an extra glass on the weekend.  This was not found to constitute a problem, and it was suggested that the mother is too sensitive about drinking alcohol.  A counselor whose test indicated that appellant may have an alcohol problem works under the assumption that a person has a problem if their spouse thinks they do, which may cause a marital problem but does not mean the one who drinks has an alcohol problem for purposes of being a parent.

¶{52} The factor concerning which parent is more likely to facilitate visitation definitely weighs in the father's favor.  See R.C 3109.04(B)(1)(f).  As aforementioned, the father, the guardian ad litem, and the psychologist were all very and justifiably concerned that the mother would deny the father visitation.  Her intent to move to Canada and her changed intent to move to another state (for no apparent reason) combined with her ability to move to Iran (a country to which the father cannot travel) provided other cause for concern.  Her mindset is that the father is evil and that the children need protection from him.  This was judged to be unfounded.  There is thus reasonable justification to worry that the mother will either secret her children or at least interfere with visitation and telephone or postal communication if she were

named residential parent. There is also concern that the mother will purposefully interfere with paternal bonding.

¶{53} Related to this is whether one parent denied the other parenting time in accordance with court order. See R.C. 3109.04(B)(1)(i). The father testified that the mother failed to bring the children to three to four visits as she claimed the children were sick. As for child support arrearage, it was noted that the father has a $4,000 arrearage from temporary child and spousal support. See R.C. 3109.04(B)(1)(g).

¶{54} The factor concerning whether either parent is planning to establish a residence out of state weighs heavily against the mother. As aforementioned, the mother insisted she was moving to Canada with the children, telling the guardian ad litem Montreal and the court Toronto. Notwithstanding the mother's immigration attorney's opinion that the father would not have much problem re-entering the country if he had to travel to Canada to visit his children and then return on a refugee document (which he did not even possess), the court could rationally find this to be a major issue and a situation that the father should avoid.

¶{55} When it occurred to the mother during trial that she may lose custody due to her insistence on moving to Canada, she stated that she would try to stay in the country but she would not live in Ohio. Although she had no support or prospects in either place, she expressed that she would move to Pennsylvania or West Virginia, apparently just for the sake of not being in Ohio. The father, however, had no plans to move from the state or the local area. Rather, he had an intent to remain in the family home.

¶{56} Finally, the court considered other relevant factors. The court noted that it was not comfortable conditioning the mother's custody on an order to remain in a certain area, stating that this may constitute an unconstitutional restriction on the right to travel. The court opined that the mother presents an unstable and unpredictable lifestyle at this point in time. The court pointed out that the mother has not looked at the cost of living and has not looked for daycare or work in any of the areas where she talks of moving.

¶{57} The mother worried about being allowed to stay in this country but put no effort into looking for work here and finding a sponsor to obtain a work visa. She

suggested this was a difficult goal; however, she was on a work visa when she first came here. Moreover, she has a college degree and two master's degrees with credit toward another. Lastly, she could have stayed in the country on a student visa as she was a college student during the marriage. She mentioned that she could not afford tuition (at a discounted rate due to the father's employment) while the divorce was pending and that she did not know that she could request tuition pending the divorce. However, she was living in the house for free, she was awarded temporary child support, and she filed a request to have the father pay for lawn care pending the divorce.

¶{58} In considering all of the best interest factors, there is no indication that the trial court acted unreasonably, arbitrarily, or unconscionably in naming the father the residential parent and providing extended visitation to the mother. The trial court was in the best position to make credibility determinations and to assign weight to each piece of evidence. Although the court could have awarded custody to the mother, the failure to do so was not an abuse of discretion. We shall not substitute our judgment for that of the trial court, whose reasoning was painstakingly explained in a lengthy and detailed entry.

¶{59} For the foregoing reasons, the judgment of the trial court is hereby affirmed.

Donofrio, J., concurs.
DeGenaro, J., concurs.